NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220832-U

NO. 4-22-0832

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JAMES SYNOWIECKI, | ) | No. 20CF227 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed defendant's conviction for delivery of methamphetamine, finding (1) sufficient evidence was presented to sustain the finding of guilt and (2) trial counsel did not render ineffective assistance.

¶ 2   Defendant James Synowiecki was convicted of delivery of methamphetamine (720 ILCS 646/55(a)(1) (West 2020)) and sentenced to five years in prison and one year of mandatory supervised release. On appeal, he argues that (1) the State failed to prove beyond a reasonable doubt that he knowingly delivered a substance containing methamphetamine to a confidential police source (CS) and (2) his trial counsel was ineffective for failing to challenge the admission of the bag containing a substance that tested positive for methamphetamine where the State failed to establish a chain of custody. We affirm.

¶ 3                               I. BACKGROUND

¶ 4        In September 2020, the State charged defendant with one count of delivery of methamphetamine to a CS. *Id.* A bench trial took place in December 2021.

¶ 5                                    A. Trial

¶ 6        On August 20, 2020, Timothy Drapeau was working with narcotics investigator Brian Maier of the Dwight Police Department as a CS. Both were part of a controlled drug buy in Pontiac, Illinois, whereby Drapeau was to meet with defendant to purchase methamphetamine with police-provided money.

¶ 7        Drapeau met up with investigator Maier, who searched Drapeau before he initially entered Maier's vehicle. Maier said he was checking for any possible contraband but found none. Drapeau further denied bringing any illicit contraband or drugs to the controlled buy and confirmed that Maier searched him before "I even got in the car." The two men drove to a location near defendant's residence, where Maier parked. Drapeau then walked a few blocks to the residence. At all times relevant to the buy, Drapeau wore an overhear device provided to him by Maier that recorded audio and video.

¶ 8        When Drapeau arrived at the residence, defendant and another unidentified individual to whom defendant had just sold a bicycle were outside. Drapeau shook hands with the individual, who then left on the bicycle, and defendant and Drapeau entered the house. All of this occurred within Maier's view.

¶ 9        The two were in the house for a short while and then continued talking outside. While in the house, Drapeau exchanged the money given to him by Maier with defendant for the methamphetamine. Concerning the exchange, Drapeau testified as follows:

> "Q. And did you receive an item in exchange for currency from [defendant]?
>
> A. Yes.

Q. And did that item appear to you to be crystal methamphetamine?

A. Yeah."

¶ 10    Drapeau was then asked:

"Q. The item that you recovered from the Defendant and later handed to Maier, is that what[ ] *** [is] People's [exhibit No.] 2?

A. Yes.

Q. Did you change or alter that in any way prior to handing it to Officer Maier after receiving it from the Defendant?

A. No."

¶ 11    Defendant's girlfriend was in the room at the time, but she was not called as a witness at trial.

¶ 12    Drapeau said he left defendant's residence and went directly to Maier's vehicle, where he gave Maier "a clear plastic bag" with "red markings." Maier said, "[T]here was a crystalline substance with my training and experience I knew that consistent to be with methamphetamine." Drapeau also believed the substance to be methamphetamine. Maier took the bag into custody and sent it off to the Illinois State Police (ISP) crime lab for confirmation and testing.

¶ 13    At this point in the trial, the State offered People's exhibit No. 2 into evidence, stating to the court, "I would move to admit People's [exhibit No.] 2. Further the parties have agreed on a stipulation as to People's [exhibit No.] 2 sent off for testing at the Joliet crime lab with the lab result resulting in People's [exhibit No.] 3." Defense counsel did not object, and the two exhibits were admitted. The ISP crime lab report confirmed the bag contained 0.4 grams of a crystalline substance identified as methamphetamine. The agency case number 20-17110 appeared

on the crime lab report, which was also written on People's exhibit No. 2 (the seized methamphetamine).

¶ 14    Drapeau and Maier were each asked what Drapeau received in exchange for his CS work. Maier said he believed Drapeau "wanted to work" because he "had a traffic citation." At the time of the buy, Drapeau's driver's license was revoked; at the time of trial, it was not. Drapeau, when asked why he worked with the police, said, "You want to know why I did it? Because I don't like [defendant]." Drapeau explained he disliked defendant "Because he slept with my ex-girlfriend." When Drapeau was asked if he had worked with the police to get revenge against defendant, he said no at first, but then acknowledged, "Well, I guess you would say it would be."

¶ 15    Drapeau was then asked:

"Q. So you wanted to get back at him?

A. I did [it] before he did it to me.

Q. Okay. So that was your motivation in setting up this whole buy?

A. Yeah."

¶ 16    He specifically denied that he had done anything to frame defendant.

¶ 17    Defendant testified at trial and maintained that he did not know why Drapeau had come to his house that day. According to defendant, he invited Drapeau inside and "talked about the bike I had just sold with him. He was telling me about some scooter that he had that I might purchase from him." The following colloquy ensued:

"Q. Was the purpose of him coming over for you, was the purpose of him coming over for you to sell drugs to him?

A. No.

Q. Did you hand him anything?

- 4 -

A. No.

Q. Did he hand you anything?

A. No."

¶ 18        Defendant was then specifically asked if Drapeau handed him any money, and defendant answered, "No." "[S]o [Drapeau] just came over to talk?" counsel asked defendant. Defendant replied, "Yes."

¶ 19        During closing arguments, defense counsel argued that Drapeau was not credible and that there was a doubt "whether or not Mr. Drapeau actually made this buy or was he trying to get [defendant] in trouble by saying he bought it. I think that's evident, and the video does not clearly show a hand-to-hand transaction in the way we think [of] it."

¶ 20                              B. Conviction and Sentence

¶ 21        Defendant was found guilty of unlawful delivery of methamphetamine. In rendering its judgment, the trial court began by stating that its determination "requires a credibility determination and findings." According to the court, accepting defendant's theory of the case at closing argument would require it to completely ignore "the testimony of Investigator Maier who specifically said that he searched Drapeau before he went into the house." The court explained this further: "[T]he CS had nothing on him at all, no contraband, no drugs or money specifically." Accepting defendant's argument, the court concluded, would require it to find that Maier was not credible. "I don't agree with that argument," remarked the court. "I think Investigator Maier was a very credible witness."

¶ 22        The trial court also rejected defendant's argument that Drapeau was not credible because he may have acted on a personal motive (whether because he did not like defendant or he received some favor on the traffic ticket). On this point, the court stated:

"I don't think [that] is really dispositive. We know that the CS got something. Did it for a reason. All CS's have motivation, and all CS's either get money or some type of compensation or some type of consideration on a pending case. So that alone does not necessarily question his credibility, particularly in a situation like this where his testimony is corroborated not only by the investigator who had eyes on him the entire time but also by the video, which albeit [is] not a perfect angle. Certainly captures who was present and what happened."

¶ 23 The trial court found that the overhear device recording corroborated Maier's and Drapeau's testimony.

¶ 24 Defendant was subsequently sentenced to five years in prison and one year of mandatory supervised release, plus four days' credit for time served.

¶ 25 This appeal followed.

¶ 26 II. ANALYSIS

¶ 27 Defendant argues that the State failed to prove beyond a reasonable doubt that he knowingly delivered a substance containing methamphetamine to a CS and that his trial counsel provided ineffective assistance because he failed to challenge the admission of the crime lab report and the chain of custody of the methamphetamine bag once obtained by Maier. We address each argument in turn.

¶ 28 A. Delivery of Methamphetamine

¶ 29 Section 55(a)(1) of the Methamphetamine Control and Community Protection Act (720 ILCS 646/55(a)(1) (West 2020)) provides: "It is unlawful knowingly to engage in the delivery or possession with intent to deliver methamphetamine or a substance containing methamphetamine." Here, defendant was charged with delivery to a CS, Drapeau.

¶ 30    In reviewing the sufficiency of the evidence in a criminal case, a reviewing court "asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28 (citing *People v. Hardman*, 2017 IL 121453, ¶ 37). A reviewing court "will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *Id.* "All reasonable inferences from the evidence must be drawn in favor of the State." *Id.* Thus, a conviction will not be overturned on appeal "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*; see *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 14 (citing *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001); see also *People v. Sanchez*, 375 Ill. App. 3d 299, 302-03 (2007)).

¶ 31    This standard applies in all criminal cases, regardless of whether the defendant was convicted by a jury or after a bench trial. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[I]n a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence.").

¶ 32    Here, from the outset, the trial court characterized this case as one where the outcome hinged upon credibility determinations. As the trier of fact, the court found that Drapeau (the CS) and Maier (the investigating officer) were both credible and that their testimony was corroborated by the audio and video evidence of the exchange. The court found it significant that Maier searched Drapeau before Drapeau entered defendant's residence and that no contraband was found. According to the testimony and the video evidence, Drapeau entered defendant's residence with police-provided money for the sale. He can be seen in the video handing something to

defendant; money appears in the video, which is subsequently counted by defendant and placed in a briefcase. Upon leaving the residence, Drapeau proceeded directly to Maier's car, where he handed Maier the package containing methamphetamine. In short, Drapeau went into the residence with no contraband and returned to Maier's car with a bag of methamphetamine. Drapeau said he did not tamper with the bag.

¶ 33 Defendant asserts that the trial court's credibility analysis is flawed and urges us to conclude that the court could have found Drapeau not credible while still concluding that Maier was credible. Defendant contends that the court's reasoning—that in order "to find [defendant] credible, [it] would have to find both [CS] Tim Drapeau and Inspector Maier incredible"—is flawed. According to defendant, "Maier was not present for the alleged hand-to-hand exchange, so the credibility of his testimony is not relevant where it contrasts with [defendant's] testimony." We disagree.

¶ 34 "Credibility determinations are entitled to great weight." *People v. Swenson*, 2020 IL 124688, ¶ 36 (citing *People v. Smith*, 185 Ill. 2d 532, 542 (1999)). "The standard for reviewing the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Minniweather*, 301 Ill. App. 3d 574, 577 (1998) (citing *People v. Brown*, 169 Ill. 2d 132, 152 (1996); *Jackson v. Virginia*, 443 U.S. 307, 313 (1979)). As stated in *Minniweather*, a judgment will not be overturned "unless its [conclusion] is so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt." *Id.* (citing *Brown*, 169 Ill. 2d at 152). Indeed, " 'the testimony of just one credible witness is sufficient for conviction.' " *Swenson*, 2020 IL 124688, ¶ 36 (quoting *City of Chicago v. Morris*, 47 Ill. 2d 226, 230 (1970)).

¶ 35 The trial court found credible Drapeau's testimony that he received methamphetamine from defendant in exchange for money. The court further found credible Drapeau's testimony that he did not alter or tamper with the bag once obtained from defendant and that he delivered it to Maier without tampering with it. Moreover, it also concluded that Maier's testimony supported Drapeau because Maier searched Drapeau before the latter entered the residence and found no contraband. Finally, the court rejected defendant's argument that Drapeau was not credible because he received something for his CS work.

¶ 36 Defendant's suggestion that "it remains plausible" that the bag of methamphetamine delivered to Maier did not come from defendant is mere speculation unsupported by any evidence in the record. See, *e.g.*, *People v. Walden*, 43 Ill. App. 3d 744, 750 (1976) ("Defendant's speculation that someone removed the gun is not borne out by any testimony or evidence."). The trial court was free to find that both were credible witnesses and to further conclude that Drapeau, who was searched before he entered the residence, was visible to Maier as he walked to and from the residence, and testified that he did not tamper with the bag, did not tamper with the bag obtained from defendant or substitute another bag.

¶ 37 For these reasons, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

¶ 38 B. Ineffective Assistance of Counsel

¶ 39 Defendant further argues he received ineffective assistance of counsel because his trial attorney failed to challenge the admission of the bag containing a substance that tested positive for methamphetamine. According to defendant, the State failed to establish a proper chain of custody for the substance. Defendant has not challenged the admission of the substance (People's exhibit No. 2) or the crime lab report (People's exhibit No. 3) on appeal, and any such argument

has now been forfeited. See *People v. Woods*, 214 Ill. 2d 455, 473-74 (2005); see *also People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (stating defendant, who affirmatively represented he had no objection at trial, was estopped under the doctrine of invited error from contending, on appeal, that evidence was inadmissible on chain of custody grounds).

¶ 40        This court analyzes claims of ineffective assistance of counsel under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (citing *People v. Evans*, 186 Ill. 2d 83, 93 (1999)); *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10. To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below minimal professional standards and (2) a reasonable probability exists the defendant's trial was affected. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88; *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010).

¶ 41        To satisfy the deficiency prong of *Strickland*, "the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as 'counsel' guaranteed by the sixth amendment." *Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (citing *Evans*, 186 Ill. 2d at 93). To satisfy the prejudice prong, a defendant must prove a reasonable probability exists that, but for counsel's errors, the result of the trial would have been different. *Id.*; *Thomas*, 2017 IL App (4th) 150815, ¶ 11; *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A "reasonable probability" has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Houston*, 229 Ill. 2d at 4. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35; *Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (quoting *Hibbler*, 2019 IL App (4th) 160897, ¶ 88).

¶ 42          A defendant's claim of ineffective assistance of counsel on appeal is governed by a *de novo* standard of review. *Hibbler*, 2019 IL App (4th) 160897, ¶ 88; *In re T.R.*, 2019 IL App (4th) 190529, ¶ 128.

¶ 43                                    1. *A Matter of Trial Strategy*

¶ 44          " 'Effective assistance of counsel refers to competent, not perfect representation.' " *People v. Evans*, 209 Ill. 2d 194, 220 (2004) (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984)). Thus, "[m]istakes in trial strategy or tactics do not necessarily render counsel's representation defective." *Thomas*, 2017 IL App (4th) 150815, ¶ 10 (citing *People v. Kyse*, 220 Ill. App. 3d 971, 974 (1991)). Indeed, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Merriweather*, 2022 IL App (4th) 210498, ¶ 40 (citing *Evans*, 186 Ill. 2d at 93). "This court is highly deferential of counsel's performance." *T.R.*, 2019 IL App (4th) 190529, ¶ 126 (citing *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38). This deferential standard is used because " '[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' " *Id.* (quoting *Strickland*, 466 U.S. at 689).

¶ 45          Illinois cases have discussed the various decisions by trial counsel that are generally considered a matter of trial strategy: whether to object to testimony (*Evans*, 209 Ill. 2d at 221), whether to object on foundational grounds (*People v. Probst*, 344 Ill. App. 3d 378, 387 (2003)), and whether to rely on one theory of defense to the exclusion of others (*People v. Hayes*, 2022 IL App (4th) 210409, ¶ 52). Here, consistent with these cases, the decision to stipulate to the admission of People's exhibit Nos. 2 and 3 represented trial strategy.

¶ 46          We first note that Illinois law is well settled that a chain of custody objection is necessary only where the witness is unable to identify the object or there is some showing that the

evidence has been tampered with or altered. *People v. Greer*, 28 Ill. 2d 107, 113 (1963). It is sufficient if the witness testifies that the object appears to be an item recognizable to him. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 45. Thus, a foundation for the introduction of an object into evidence may be laid either through its identification by a witness or through the establishment of a chain of possession. *Greer*, 28 Ill. 2d at 113 (citing *People v. Judkins*, 10 Ill. 2d 445, 448-49 (1957)).

¶ 47 In the instant case, both Drapeau and Maier identified Peoples' exhibit No. 2 as the bag that Drapeau obtained from defendant. Maier further testified that he recognized the bag's "red markings." He also testified that he took possession of the bag and sent it to the ISP crime lab. Once the State established it was " 'unlikely that the evidence [had] been altered,' " the burden shifted to defendant to produce evidence of " 'actual tampering, substitution or contamination.' " *Smith*, 2014 IL App (1st) 103436, ¶ 47 (quoting *Woods*, 214 Ill. 2d at 467). At that point, any alleged deficiencies in the chain of custody that did not constitute " 'actual tampering, substitution or contamination' merely affect[ed] the weight of the evidence, not its admissibility." *Id*. Therefore, it is questionable whether a chain of custody objection would have been well founded in this case because Maier and Drapeau positively identified the bag and Maier testified that he took the bag into custody and sent it to the crime lab. Under *Smith*, the State met its burden.

¶ 48 Even so, it is clear from the record that defense counsel's trial strategy was to show Drapeau was not credible and that he either tampered with the bag (People's exhibit No. 2) or got it from somewhere else to frame defendant; it was not to attack the chain of custody once in the possession of law enforcement. This is evident from counsel's remarks during closing argument, wherein he stated, "[W]e believe there is a reasonable doubt here as to whether a delivery was made. The substance is methamphetamine; and my client was there; and the interaction that we

saw on the video did take place. That's not at issue." He continued, "What is at issue is whether that video really shows a transaction or not." He then went on to say that "there's a doubt here whether or not Mr. Drapeau actually made this buy or was he trying to get [defendant] in trouble by saying he bought it."

¶ 49    Defense counsel's trial strategy was to call into question Drapeau's conduct with respect to the bag, not the police. Indeed, it appears that defendant even acknowledged the bagged substance was methamphetamine but simply disagreed where it came from. Defendant's theory was that a bag of methamphetamine was supplied to Maier by Drapeau and falsely attributed to him; such a strategy *presumes* that the bag contained methamphetamine. Thus, it may be reasonably assumed that defendant's trial counsel decided to forgo the opportunity to challenge the police chain of custody in order to focus on other theories of the defense, namely, that there was no transaction and Drapeau, not the police, tampered with the evidence.

¶ 50    On appeal, defendant now appears to be arguing a lack of chain of custody *from Maier to the crime lab*. Indeed, his brief concedes that a chain of custody existed from the moment Drapeau received the bag until delivering it to Maier, which is contrary to his position at trial. Moreover, he now contends, "There was no other evidence presented as to what happened to the bag between Maier's receiving it from the CS in his vehicle and the test results on People's [exhibit No.] 2 from the [ISP] crime lab, admitted as People's [exhibit No.] 3." In essence, defendant has changed his strategy, apparently seeking to avoid his procedural forfeiture by claiming that the stipulation was the product of ineffective assistance of counsel.

¶ 51    We note a similar result obtained in *People v. Hunter*, 376 Ill. App. 3d 639, 642 (2007), where the defendant argued on appeal that he had been denied effective assistance of counsel because his trial attorney had stipulated to the admission of the forensic chemist's

testimony. The *Hunter* court observed that the defendant's "theory at trial was that he was improperly arrested and never possessed the controlled substances." *Id*. at 644. According to the court, "[t]here was no reason to address the characteristics of the controlled substances and to do so would have been inconsistent with the defense strategy." *Id*. Accordingly, the court concluded that "trial counsel's performance did not fall below an objective standard of reasonableness." *Id*. We find *Hunter* instructive.

¶ 52 An attorney's performance is deficient where the errors made were so serious that the attorney " 'was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *People v. Page*, 2022 IL App (4th) 210374, ¶ 28 (quoting *Strickland*, 466 U.S. at 687). "Incompetency of that magnitude is not established, however, where retained counsel fails to object to inadmissible evidence [citation], or fails to move to suppress certain evidence and makes other errors of judgment or trial strategy." *People v. Somerville*, 42 Ill. 2d 1, 5 (1969). The record does not support such a conclusion here. As stated earlier, a review of defense counsel's competency does not extend to areas that involve the exercise of judgment and trial strategy. *Kyse*, 220 Ill. App. 3d at 974 (citing *Somerville*, 42 Ill. 2d at 5). We therefore conclude that defendant has failed to establish the first prong of *Strickland*'s test. Counsel's actions in this case were an exercise of trial strategy.

¶ 53                              2. *Lack of Prejudice*

¶ 54 An ineffective assistance of counsel claim may also be defeated by a finding that there was no prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17. A similar issue arose in *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 2, a recent case before this court where the defendant argued that his trial counsel's failure to object to a chain of custody amounted to ineffective assistance of counsel. In finding no prejudice, this court explained:

"Let us assume, for the sake of argument, that the omission of a chain-of-custody objection was deficient performance. Even so, to find prejudice from the omission of such an objection, we would have to find a reasonable probability that, if defense counsel had made such a chain-of-custody objection, the State would have been unable to cure the objection (and, consequently, the circuit court would have refused to admit People's exhibit No. 1 and would have acquitted defendant of count IV). In the record before us, we find no basis for asserting a reasonable probability that the State would have been incapable of curing any chain-of-custody objection." *Id.* ¶ 64.

¶ 55   As in *Aquisto*, we find no basis for finding a reasonable probability that the State would have been incapable of curing any chain-of-custody objection in the instant case.

¶ 56   In *Woods*, 214 Ill. 2d at 474, a case where the defendant was found to have forfeited his chain of custody objection by stipulating to the testimony of a chemist, our supreme court remarked:

"[I]t is apparent that the intention of the parties' agreement to stipulate to the chemist's testimony in a summary and brief manner served to remove from this case any dispute with respect to the chain of custody or the chemical composition of the recovered substance. It is unlikely that the State would have agreed to Gilbert's stipulated testimony, and thereby forfeit the opportunity to place the chemist on the witness stand to describe in detail the packets received from the police department, how they were received, the condition they were in, and the tests performed, had not the stipulation been intended to eliminate the need for defending this testimony against a challenge to the chain of custody. In addition, it may be

- 15 -

reasonably assumed that defendant's trial counsel decided to forgo the opportunity to cross-examine the expert in order to focus on other theories of the defense."

¶ 57 Although *Woods* addressed the direct appeal of a chain of custody issue, and not an ineffective assistance of counsel claim based upon the failure to challenge a chain of custody issue, we nevertheless find it helpful to our analysis. As in *Woods*, the stipulation entered into here by defense counsel dispensed with the State's need to establish a chain of custody regarding People's exhibit No. 2. Thus, as in *Woods*, by stipulating to the chemist's report and not raising the chain of custody issue at trial, defense counsel placed the State in the position of believing that the sufficiency of the chain of custody was not at issue. "If defendant's trial counsel had explicitly stated that he was stipulating to the chemist's report but not to the chain of custody, the State would have been afforded the opportunity to remedy the matter at the trial level." (Emphasis omitted.) See *id.* at 475. As stated, however, defendant did not challenge the police's chain of custody at any point in the trial proceedings.

¶ 58 As a final point, we find our prior decision in *People v. Echavarria*, 362 Ill. App. 3d 599 (2005), significant. There, the parties stipulated as to what a state police forensic scientist would testify to, as well as how he received and returned the exhibit, a bag of cocaine. *Id.* at 607. The court found this testimony "sufficiently established a reasonable probability the cocaine was not tampered with or substituted." *Id.* At that point, the court concluded that "[i]t was then incumbent on defendant to put forth evidence the cocaine was tampered with or substituted or a mistake occurred." (Emphasis omitted.) *Id.* The court then noted that, even with the stipulation, there remained several unanswered questions concerning the chain of custody:

"The record contains no evidence either by live testimony or stipulation as to what Sergeant Swenson did with the plastic bag he recovered from defendant. No

- 16 -

evidence showed the bag was placed in a closed or sealed container or was initialed or dated by Sergeant Swenson. No evidence showed where the bag was stored after it was recovered by Sergeant Swenson or when it came into the possession of Willie Gartrell. From the stipulation, we know Gartrell is 'from Task Force X,' but we do not know how he was involved in this investigation, how the exhibit came into his possession, or how he stored the exhibit while it was in his custody. The stipulation describes the bag as a sealed evidence bag. [Citation.] No evidence showed how a bag taken from defendant ended up in a sealed evidence bag. No evidence showed this bag is different in any way from other bags of controlled substances that may have been handled by the task force, or transported to the lab, or stored. No evidence showed the bag presented as exhibit No. 1 is the same one recovered from defendant by Sergeant Swenson. The stipulation clearly resolves that what forensic scientist Martin tested was cocaine. The stipulation does not answer the points raised above." (Emphasis omitted.) *Id*. at 607-08.

¶ 59 Even with these open questions, the trial court concluded that the State had "met the minimum standard enunciated in *Woods*." *Id*. at 608. In view of *Echavarria*, where similar questions were raised as to the police chain of custody, the testimony in the instant case was sufficient to meet the minimum standards. Thus, even if defendant had preserved an objection, he could not establish the requisite prejudice.

¶ 60 We conclude that defendant has failed to establish prejudice and, therefore, he has failed to satisfy *Strickland*'s second prong. The inability to satisfy either prong of *Strickland*'s test precludes a finding of ineffective assistance of counsel. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002) (citing *Strickland*, 466 U.S. at 697). Here, defendant cannot satisfy either prong.

¶ 61                                    III. CONCLUSION

¶ 62            For the reasons stated, we affirm the trial court's judgment.

¶ 63            Affirmed.